UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

In re:                                      )
                                            )
   JOSEPH CACCAMISE                         )    Case No. 09-17165-SSM
   CYNTHIA WALTERS-CACCAMISE               )    Chapter 13
                                            )
             Debtors                       )

## MEMORANDUM OPINION

Before the court are (a) the objection of Thomas P. Gorman, standing chapter 13 trustee, to confirmation of the modified plan filed by the debtors; and (b) the motion of the debtors to obtain credit from Alliant Credit Union ("Alliant"). Under the plan, Alliant is separately classified and would be paid in full on two unsecured claims while other unsecured creditors are compromised at less than 3 cents on the dollar. A hearing was held on December 9, 2009, at which the debtors were present in person and were represented by counsel. The trustee opposed both the plan and the motion as unfairly discriminating in favor of Alliant. The court ruled from the bench that the objection to confirmation would be overruled but took the motion to obtain credit under advisement. Upon further review, the court determines that the plan and motion are so intertwined that neither can be viewed in isolation. After considering the reasons for, and the effect of, the separate classification, the court concludes that although the proposed payment of one of the unsecured claims in order to obtain post-petition credit is appropriate, the other is not. For that reason, the plan will be denied confirmation and the motion to obtain credit will be granted only in part.

Background

Joseph Caccamise and Cynthia Walters-Caccamise are husband and wife. He is employed as a customer service representative; she is an independent contractor real estate agent. On September 1, 2009, they filed a joint petition in this court for adjustment of their debts under chapter 13 of the Bankruptcy Code. On their schedules, they listed $23,895 in unsecured debt, of which $4,838, or approximately one-fifth, was owed to Alliant on two credit card accounts. They also reported $5,195 in combined take-home pay and $5,088 in monthly expenses, for a monthly surplus of $108 a month. After the trustee objected to their initial plan, they filed the plan that is currently before the court on October 30, 2009 (Doc. # 30). It proposes to pay the trustee $264.20 per month for 12 months, followed by $186.45 per month for 24 months, for a total of $7,645.20. From the payments received, the trustee would pay his statutory commission of 10%, attorney's fees to the debtors' counsel of $933, and a priority tax claim of $2,836. The balance of the funds would be paid pro rata to unsecured creditors, other than Alliant, with the estimated distribution being 16 cents on the dollar. The debtors would make direct payment of two car loans and the first mortgage against their residence, none of which are shown as being in default. Although the plan does not explicitly address the treatment of the second mortgage held by PNC Bank ("PNC") in the amount (based on its filed proof of claim) of $93,093.76, the debtors have filed a separate adversary proceeding to "strip off" the PNC mortgage, which, if successful, would result in its claim being treated as unsecured under the plan.[1]

---

[1] The result of the strip-off would be a dramatic reduction in the percentage distribution to unsecured creditors from the advertised 16%. After payment of the trustee's commission, attorney's fees, and priority tax claims, the amount available for unsecured claims is $3,112. To the scheduled $19,057 in unsecured claims (other than Alliant's) would be added the now-
(continued...)

With respect to Alliant—with whom, according to the motion, the debtors have had credit card accounts for some thirty years—the debtors propose to make full payment of the prepetition balances on the two credit cards (one used by the husband, the other by the wife) outside the plan in exchange for Alliant's agreement to allow them to continue to use the accounts. The husband's account, according to the schedules, has a balance of $4,067; the wife's has a balance of $771. The accounts would have an interest rate going forward of 12.9%. The purpose of the post-petition borrowing, according to the motion, is "for personal finances to rebuild credit rating" and for the wife's ordinary business expenses. The husband's account would have a credit limit of $12,500 and the wife's account would have a credit limit of $13,000. The minimum monthly payment on each account would be 2% of the balance or $25, whichever is greater.

## Discussion

### A.

Few principles are more firmly fixed in bankruptcy than equal treatment of similarly-situated creditors. Although a chapter 13 plan may "designate a class or classes of unsecured claims," the plan may "not discriminate unfairly against any class so designated." § 1322(b)(1), Bankruptcy Code. Clearly the debtors' plan discriminates in favor of Alliant by providing for 100% payment of its unsecured claim (with interest), while paying other unsecured creditors less than 3 cents on the dollar. The question, then, is whether the proposed discrimination is unfair.

---

[1](...continued)
unsecured $93,093 PNC claim, for total unsecured claims of $112,150. That amount, divided by the $3,112 available for unsecured claims, results in a percentage distribution of only 2.7%.

3

This court has previously addressed the applicable standard, albeit in a different factual context. *In re Delauder*, 189 B.R. 639 (Bankr. E.D. Va. 1995). As explained in that opinion:

> Early cases attempting to derive a rule for determining what kind of discrimination would be considered unfair looked to whether there was a "rational" reason for the separate treatment. As a result, each case tended to be decided subjectively on its own facts and no clear rule of law developed. *See In re Fizer*, 1 B.R. 400 (Bankr. S.D. Ohio 1979) (no "rational basis" for a plan which paid 100 percent to one class and nothing to other classes; confirmation denied); *In re Curtis*, 2 B.R. 43 (Bankr. W.D. Mo. 1979) (rational basis found for plan which paid 100 percent on child support claim and 10 percent on other unsecured claims; confirmation granted); *In re Tatum*, 1 B.R. 445 (Bankr. S.D. Ohio 1979) (no rational justification found for a plan which paid some claims outside the plan even though all allowed claims were to be paid in full); *In re Weeden*, 7 B.R. 106 (Bankr. D. R.I. 1980) ("sufficient justification" not shown to permit confirmation of 100 percent plan which proposed to pay debt owed to debtor's sister outside plan).
>
> In light of these divergent opinions, later cases began to consider more than the "rationality" of the debtor's classifications. The courts instead began to look at practical considerations such as the importance of the classification to the debtor's rehabilitation. Additionally, the courts evaluated whether the debtor acted in "good faith" in setting up the separate classification. *In re Moore*, 31 B.R. 12 (Bankr. D. S.C. 1983).
>
> A number of tests have emerged to aid in assessing whether a classification discriminates unfairly under § 1322(b)(1), and, thus, whether separate classification should be disallowed. This court finds the five-part test articulated in *In re Husted*, 142 B.R. 72 (Bankr. W.D. N.Y. 1992) to be particularly useful. In *Husted*, the court, in determining that a plan did not "discriminate unfairly" by proposing to pay the debtor's obligation for past-due child support in full, while paying only 25 percent on other unsecured claims, set forth the following test:
>
> > 1. Whether there is a rational basis for the classification;
> > 2. Whether the classification is necessary to the debtor's rehabilitation under chapter 13;
> > 3. Whether the discriminatory classification is proposed in good faith;
> > 4. Whether there is a meaningful payment to the class discriminated against; [and]
> > 5. The difference between what the creditors discriminated against will receive as the plan is proposed, and the amount they would receive if there was no separate classification.

> The debtor bears the burden of showing that the proposed classification does not discriminate unfairly. *In re Moore*, 31 B.R. at 16. While the *Husted* factors are helpful, they do not constitute bright-line standards. Accordingly, the court must conduct a flexible case-by-case analysis in determining whether a plan discriminates unfairly and must consider all pertinent factors. *In re Bowles*, 48 B.R. 502, 507 (Bankr. E.D. Va. 1985) (Shelley, J.).

*Delauder,* 189 B.R. at 643-44 (footnote omitted).[2] The Fourth Circuit has not addressed the standard for separate classification in a chapter 13 case, but other reported opinions since *Delauder* have generally applied either the five-part *Husted* test or a four-part test consisting of the first four of the *Husted* factors. *See In re Kolbe*, 199 B.R. 569, 573 (Bankr. D. Md. 1996) (applying five-part test to deny confirmation of plan that paid student loans in full while compromising other unsecured claims); *In re Labib-Kiyarash*, 271 B.R. 189 (9th Cir. B.A.P. 2001) (using four-part test). *But see In re Crawford*, 324 F.3d 539 (7th Cir. 2003) (affirming district court, which in turn affirmed bankruptcy court's holding that after applying four-part test, the separate classification of child support obligations unfairly discriminated against other unsecured creditors, but declining to apply the four-part test itself and simply stating that the bankruptcy court must determine if the classification is reasonable).

---

[2] The challenged classification in *Delauder* involved an under-secured automobile loan on which the debtor proposed to make the contractually-due payments outside the plan. In overruling the trustee's objection to confirmation, the court considered, in addition to the five factors identified in *Husted*, a sixth factor, namely "whether the disparate treatment is specifically authorized by some other provision of the Bankruptcy Code." *Delauder*, 189 B.R. at 644. The court found such authorization in § 1322(b)(5), Bankruptcy Code, which allows a debtor to maintain contractual payments on long-term debt on which the last payment under the contract is due after the last payment under the plan. Additionally, based on the specific mathematics of that case, paying the secured and unsecured portions of the automobile debt within the plan would actually have *reduced* the percentage payout to unsecured creditors. *Id.* at 646.

B.

With regard to the credit card account in the wife's name, the court concludes that there is a rational basis for the classification, and that the classification—while it may or may not be "necessary" in the strict sense—is nevertheless likely to promote the debtors' rehabilitation under chapter 13. As an independent contractor real estate agent, the wife receives income only when a real estate sale is consummated, and it seems likely that a number of business-related expenses, such as advertising, would often need to be incurred in order to bring about the sale. Since the money to pay the expenses might not materialize for several months after the expense is incurred, having a credit card to which the payment could be charged makes sense. As counsel for the debtors correctly points out, a chapter 13 debtor engaged in business "may operate the business of the debtor, and subject to any limitations on a trustee under sections 363(c) and 364 . . . shall have, exclusive of the trustee, the rights and powers of the trustee under such sections." § 1304, Bankruptcy Code. Section 364 in turn allows a trustee "to obtain unsecured credit and incur unsecured debt in the ordinary course of business" and, with court approval, to incur debt, both secured and unsecured, outside the ordinary course of business, with various levels of protection for the creditor if credit cannot be obtained on an unsecured basis. *Id.* § 364(a)-(d). Although no provision of Section 364 specifically authorizes payment of prepetition debt as an inducement for a creditor to extend post-petition credit, so-called "roll-up" provisions, while not favored, are not unknown in chapter 11 cases. Here, the existing balance of $771 is small in relation to the $13,000 in credit that would be available to assist the wife in carrying on her business. For that reason, the court would have to conclude that the discriminatory classification is proposed in good faith, even though it is also true that the class discriminated

6

against is not receiving a meaningful payment.  Moreover, given the relatively small prepetition balance, there is only a minimal difference between what the unsecured creditors other than Alliant will receive as the plan is proposed and the amount they would receive if there was no separate classification of the debt owed on the wife's credit card.

The court reaches a contrary conclusion, however, with respect to the husband's credit card.  First, no evidence has been presented to show—and the court is otherwise unable to discern—any rational basis for the separate classification or that the classification is necessary for the debtors' rehabilitation.  Merely reciting that paying the existing balance as a condition of keeping the account open will help the debtors "rebuild [their] credit rating" is not a sufficient basis for extending favored treatment to one creditor while others are taking a financial bath.  The court is of course aware that in a world increasingly dominated by e-commerce, having a credit card is at least useful, and sometimes necessary, for payment of purchases and ordinary living expenses.  However, prepaid "credit" cards exist that allow the convenience of credit card purchases without the actual incurrence of debt.   For that reason, the court cannot find that payment of the existing balance in order to keep a particular credit card—even one that the husband has had for a long time—is "necessary" to his financial rehabilitation, particularly when, as here, there is no meaningful payment being made to other unsecured creditors.  The proposed discrimination, moreover, has a significant effect on the percentage payout to the unsecured creditors.  If the $4,067 that would be paid to Alliant were instead paid into the plan, the amount available to pay the unsecured claims would increase to $7,178.  Of course, the pool of unsecured claims would also increase by $4,067, bringing the total to $116,217.  But the resulting dividend to unsecured creditors would nevertheless increase to 6.2%, or more than

double the 2.7% percent unsecured creditors will receive under the plan as proposed.  For these reasons, the court concludes that the separate classification of the debt owed to Alliant on the husband's credit card unfairly discriminates against the other unsecured creditors, and that the motion to incur debt, to the extent it requires full payment of the prepetition balance on that account, cannot be granted.

Separate orders will be entered denying confirmation of the plan, granting the motion to obtain credit with respect to the wife's credit card account, and denying the motion with respect to the husband's account.

Date: _____              _____
                                            Stephen S. Mitchell
Alexandria, Virginia                        United States Bankruptcy Judge


Copies to:

Martin C. Conway, Esquire
Pesner Kawamoto Conway, PLC
7926 Jones Branch Dr. Suite 930
McLean, VA 22102
Counsel for the debtors

Joseph Caccamise
Cynthia Walters-Caccamise
6282 Redwinged Blackbird Drive
Warrenton, VA 20187
Debtors

Thomas P. Gorman, Esquire
300 N. Washington St., Suite 400
Alexandria, VA 22314
Chapter 13 Trustee